## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00543 (CRC)** |
| **v.** | : | |
| | : | |
| **LOAMMI YAZDANI-ISFEHANI** | : | |
| a/k/a "Elijah Yazdani" | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant, Loammi Yazdani-Isfehani, a/k/a "Elijah Yazdani", to a split sentence of 30 days' incarceration, followed by 36 months of probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Loammi Yazdani-Isfehani, a/k/a "Elijah Yazdani"  ("Loammi," to distinguish him from his co-defendant siblings who share the same last name), a 32-year-old employee of the United States Postal Service, who resides in Albany, Ohio, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on August 10, 2022, (ECF No. 53 at  p. 2, ¶ 4) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Loammi pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because (1) he approached the Capitol building on the West Front, an area where officers violently battled with the mob of rioters attempting to force their entry inside of the Capitol, (2) he entered the Capitol through the Upper West Terrace Doors within minutes of the breach of the location, resulting in a flood of rioters entering the location, (3) he ignored orders to leave the Capitol after he entered, (4) he ignored the plumes of tear gas and sirens blaring inside of the Capitol as officers attempted to remove rioters, (5) he proudly proclaimed his entry into the Capitol by texting videos and photographs of the inside of the Capitol after January 6, (6) he boasted that he would never be caught by law enforcement after his sisters removed a disk of videos and photographs from his cell phone, containing content captured while they were inside the Capitol, and (7) he has not expressed remorse for his conduct on January 6.

The Court must also consider that Loammi's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, Loammi's participation in a riot that succeeded in halting the Congressional certification, combined with his endorsement of his entry inside of the Capitol, and his lack of remorse, support a sentence of 30 days' incarceration, followed by 36 months' probation, 60 hours of community service, and $500 in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot

cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.

### A.  Defendant Loammi's Role in the January 6, 2021 Attack on the Capitol

Before traveling to Washington D.C., Loammi, openly expressed his opinion to friends and family that the result of the 2020 Presidential Election was fraudulently obtained. Loammi and his siblings decided to travel to Washington D.C. to attend the "Stop the Steal" rally to hear then President Donald Trump speak.  The day prior to January 6, they rented a vehicle and traveled to Washington D.C.

On the morning of January 6, Loammi, Abigail, and Loruhamah went to the Trump Stop the Steal rally.  Loammi, Abigail, and Loruhamah approached the Capitol from the West Front. Shortly before 2:00 p.m., along with thousands of others, Loammi Abigail, and Loruhamah, entered the grounds of the Capitol and approached the Capitol from the northwest.  Approximately one hour earlier, at 12:52 p.m., rioters had first breached the outer perimeter of the Capitol Grounds, near the Peace Circle at the end of Pennsylvania Avenue (Area A in Government Exhibit 1, below), shoving the handful of United States Capitol Police ("USCP") officers stationed at the barriers there out of the way and flooding onto the Lower West Plaza of the Capitol (Area C in Government Exhibit 1, below).  At approximately 2:09 p.m., rioters broke through a line of USCP officers standing on the landing of the northwest stairwell.  The mob of rioters surged towards the Capitol building.

*Government Exhibit 1*



Loammi, Abigail, and Loruhamah were captured in the crowd as police officers were deploying control devices to stop the rioters from attempting to break through the line of officers positioned at the top of the northwest stairs. *See* Image 1.

*Image 1*



4

Loammi, Abigail, and Loruhamah continued to make their approach closer to the Capitol. Abigail and Loruhamah were captured standing in the crowd, closer to the northwest stairwell after the breach.  *See* Image 2.

*Image 2*



Loammi, Loruhamah, and Abigail, continued to make their way to the Capitol, eventually making their way to the Upper West Terrace Doors.  Prior to Loammi arriving, a crowd of rioters made their entrance into the Capitol Building at the Upper West Terrace Doors.

Initially, police officers attempted to use the Upper West Terrace Doors as an exit point for rioters who had entered the building.  The officers began shepherding rioters out of the building at approximately 2:33 p.m. Eventually, the officers were overrun by rioters attempting to enter the

building at approximately 2:35 p.m.  The rioters held the Upper West Terrace until police officers regained control at about 5:07 p.m.  In the interim, numerous skirmishes and confrontations occurred as protestors were forced down the stairs and off the Upper West Terrace.

As shown in Images 3 and 4, below, Loammi, Abigail, and Loammi, entered the Capitol at 2:37 p.m., within minutes of the breach, at a point when the officers guarding the doorway were overwhelmed by the rioters.

*Image 3*



*Image 4*



Once inside, Loammi and his siblings walked up a nearby stairwell to the second floor of the Capitol where they entered the Rotunda and Statuary Hall before joining with a crowd of rioters walking through the Statuary Hall Connector, near the House Chamber.  Two USCP officers were captured on surveillance standing in the entrance of the doorway.  *See Image* 5, below.

*Image 5*



As rioters entered the building, at least one officer was heard telling a reporter who was entering, "No you can't come in. Nobody can come in."  Loammi, Abigail, and Loruhamah entered through

7

the glass doors near the stairwell as the officer made the statement.  A still photograph of the captured from an open-source video[2] is below. *See* Image 6, below.

*Image 6*



At approximately 2:44 p.m., rioter Ashli Babbitt was shot outside of the north side of the House Chamber.  In response, Capitol police officers responded to the shooting.  Loammi stood in the hallway as numerous officers ran through the hall towards him and the crowd of rioters, making their way to the location of the shooting.  The officers pushed their way through the crowd in order to make a clear path for them to pass.  While Loammi did not observe the shooting, he turned his attention towards the commotion along with the other rioters who stood photographing the officers running through the hallway.  Loammi used his cell phone to capture photographs and take videos.  Images 7-10, below, are still photographs, taken from Government Exhibit 3, a video of Loammi, Abigail, and Loruhamah inside of Statuary Hall.[3]

---

[2] *See*  Government Exhibit 2, https://www.youtube.com/watch?v=L5hksM_R59M&t=23 at 0:22 seconds. YouTube | Insider News (UCHjm6wybRbldhqveS7c2WTA). New Footage Shows What It Was Like Inside The Trump Mob At The Capitol | On The Ground.  Government's Exhibit 2 has been uploaded to USA*fx*.
[3] *See* Government Exhibit 3, beginning at 1:40 and ending at 2:10.  Government Exhibit 3 has been uploaded to USA*fx*.

*Image 7*



*Image 8*



*Image 9*



*Image 10*



After the shooting, Capitol officers released tear gas in an effort to remove the rioters from the building.   Surveillance video captured Loammi and Abigail covering their faces and Loruhamah wiping her eyes after experiencing the effects of the tear gas.  *See* Images 11 and 12, below.  *See also* Government Exhibit 3, beginning at 3:30 and ending at 6:40.

*Image 11*



*Image 12*



Despite being tear gassed, Loammi remained in the Statuary Hall as officers continued to respond to the Babbitt shooting. *See* Images 13 and 14, below.

*Image 13*



*Image 14*



When officers observed that rioters continued to linger in the hallway, they approached

Loammi and his siblings and commanded them to leave. *See* Image 15, below.

*Image 15*



One officer directed Loammi and his siblings specifically to leave the Capitol building. *See* Image 16, below.

*Image 16*



Loammi ignored the officers' commands and remained inside the building.

In response, a USCP officer physically pushed Loammi, and placed his hand on the right shoulder of Abigail, physically turning them in the direction of Statuary Hall, where rioters were being guided by officers to an exit point. *See* Image 17, below, and Government Exhibit 3, beginning at 7:20 and ending at 7:40.

*Image 17*



The officer kept his gaze upon Loammi, Abigail, and Loruhamah, as they walked to the opposite end of the hallway.  At one point, the officer steered Loammi to the exit with his hand. *See* Image 18, below, and Government Exhibit 3 beginning at 7:30 and ending at 7:40.

*Image 18*



14

After leaving the Statuary Hall Connector, Loammi, Abigail, and Loruhamah followed other rioters as they walked through Statuary Hall.  *See* Image 19, below.  While inside of Statuary Hall, Loammi, Abigail, and Loruhamah can be seen walking past an officer who told rioters that they needed to exit the building.[4]

*Image 19*



After walking through the Rotunda, Loammi followed a crowd of rioters walking in the direction of an exit near the Rotunda where police officers awaited the group of rioters exiting the building.  While inside the Rotunda, Loammi, Abigail, and Loruhamah observed a line of officers trying to remove rioters from inside of the Rotunda.  Loammi continued to cover his face after being exposed to the tear gas in the corridor.  *See* Image 20, below.  A still from the YouTube video, Mike Komadovsky (MikeKomadovsky) Siege of the US Capitol, captures Abigail, Loruhamah, and Loammi, in the Rotunda standing within feet of the officers.[5]

---

[4] *See* Government Exhibit 4, Parler u15B2m0pJPOV.mp4,
https://web.archive.org/web/submit?url=https://video.parler.com/u1/5B/u15B2m0pJPOV.mp4
Government Exhibit 4 has been uploaded to USA*fx*.

[5] *See* Government Exhibit 5, YouTube | Mike Komadovsky (MikeKomadovsky) Siege of the US Capitol.
Exclusive footage.mp4,  https://www.youtube.com/watch?v=meUS1spn1xk&t=34 at 0:33. Government
Exhibit 5 has been uploaded to USA*fx*.

*Image 20*



Minutes before Loammi, Abigail, and Loruhamah exited this location, a group of rioters breached this location and attempted to enter while the officers were allowing the rioters to exit. *See* Government Exhibit 6.[6]  Loammi and his siblings watched as the rioters flooded the doorway. *See* Images 21 and 22.

*Image 21*



---

[6] Government Exhibit 6 has been uploaded to USA*fx*.  The rioters begin flooding in the Rotunda Door Interior at the beginning of the video.  Loammi, Loruhamah, and Abigail come into frame at approximately the 1:07 mark.

*Image 22*



Loammi and his siblings exited the Capitol at 3:14 p.m. after spending 37 minutes inside of the building.  They left Washington D.C. on the evening of January 6 and traveled back to their homes in Ohio.

Upon returning to Ohio, Loammi told close family members that he had gone to the Capitol on January 6.

### B.  Loammi's FBI Interview

Loammi was arrested by the FBI in May 2021.  After his arrest, Loammi consented to a voluntary, recorded interview.  Loammi described what he heard and saw while he attended the Stop the Steal rally.  Loammi joined in with rioters chanting "USA!"  He also heard rally attendees chanting rhetoric about the hanging of then Vice President Mike Pence.  While Loammi denied joining in that particular chanting, he admitted that he became angry when he heard that Vice President Pence would not stop the certification process.

As it relates to the violence that occurred outside of the Capitol, Loammi admitted that he saw rioters physically fighting with police officers.  He described seeing "gas bombs" being thrown by officers at the rioters, officers "take down someone who was banging on windows,"

rioters climbing scaffolding, and rioters "forcing" themselves inside of the Capitol.  Loammi also told FBI agents that he heard radio show host, Alex Jones, using a megaphone, telling rioters not to enter the Capitol for fear that the media would confuse the rioters with members of Antifa who were entering the Capitol.  Based on Loammi's descriptions, it is likely that he described the battle that occurred between officers and rioters who breached the police lines at the Lower West Terrace.

Loammi admitted to entering the Capitol.  While he described seeing police officers standing near what was later determined to the stairs of the Upper West Terrace Doors, he claimed that the officers allowed him and the rioters to enter the building.  He denied chanting as he entered the building.  While inside, he admitted to being "a couple hundred feet" of the location of where rioter Ashli Babbitt was shot, although he denied observing the shooting.

Loammi also described his encounter with officers inside of the Capitol.  He admitted that "a police officer came and started yelling for us to get out."  His statement corroborates the still photographs showing a USCP officer ordering Loammi and his sisters to leave. *See* Images 16-18 and Government Exhibit 3.  Loammi also recalled seeing rioters fighting with officers inside of the Rotunda.

Loammi identified his sisters as having been in the Capitol with him, telling agents that his sisters would have seen everything that he saw.

In his Statement of Offense, Loammi admitted that he entered the Capitol without permission to do so. ECF No. 53 at  p. 3-4.

*The Charges and Plea Agreement*

On April 28, 2021, Loammi was charged by Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 3, 2021, he was arrested in Albany, Ohio.  Loammi was charged in a four-count  Information on August 26, 2021.

Subsequently, the government identified Loruhamah and Abigail as having been inside of the Capitol with Loammi on January 6. As a result, on February 18, 2022, the government charged Loammi, Loruhamah, and Abigail, in a Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). A Superseding Information charging Loammi, Loruhamah, and Abigail with the aforementioned four counts was filed on March 8, 2021. On August 19, 2021, Loammi pled guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing inside of the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Loammi agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Loammi now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Loammi faces up to six months of imprisonment and a fine of up to $5,000. Loammi must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as

described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration, followed by 36 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots.  It represented a grave threat to our democratic norms and practices.  Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while assessing Loammi's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Had Loammi personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of Loammi is therefore not a mitigating factor in misdemeanor cases.

Loammi's conduct is that of an individual who was undeterred by the visible signs that existed on January 6, clearly notifying him that he was not authorized to enter the Capitol.  When he entered the Capitol, he did so within minutes of the breach of the Upper West Terrace Doors, after observing a violent altercations between police officers and rioters.  He also observed property damage to the Capitol, caused by rioters attempting to enter the building, as well as rioters climbing scaffolding in an effort to make their way inside of the Capitol.  All of these observations occurred after hearing that rioters intended to violently harm then Vice President Pence after learning that he would complete the certification process.  Loammi ignored all of these observations and still decided to enter the Capitol.

When Loammi entered the building, he would've heard alarms blaring inside, signaling that the Capitol had been breached.  Still, he remained inside of the building, making his way to the Rotunda and Statuary Hall.

Additionally, despite seeing the presence of police officers responding to an unknown threat, eventually determined to be the shooting of Ashli Babbitt, Loammi did not leave the building.  He ignored the distribution of tear gas as it filled the hallway, an obvious sign that officers were attempting to rid the Capitol of the rioters.  Instead, he used his cell phone to capture the chaos and mayhem.

When Capitol officers directed Loammi and his siblings to leave, they disobeyed that order.  Instead, one officer had to make physical contact with Loammi and Abigail to get them to leave

the area.  Despite receiving numerous orders to leave, Loammi remained inside of the building for 37 minutes.

After leaving the Capitol, Loammi bragged about not being identified by law enforcement because his sisters had erased and/or removed the videos and photographs that he took inside of the Capitol from his phone.

Loammi has not expressed remorse for his conduct.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Loammi

Loammi is 32 years old and lives in Albany, Ohio. PSR ¶¶ 42, 47.  He has no juvenile or adult criminal convictions.  PSR ¶¶ 35, 36.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that Hodgkins and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Loammi's conduct on January 6 demonstrates the need for specific deterrence. Despite observing violence to officers and destruction of the Capitol prior to entering the building, he made the decision to enter. While inside of the Capitol, he ignored officers' requests that he leave. As of the date of this filing, he has not expressed remorse.

The government acknowledges that Loammi accepted responsibility early by entering into this plea agreement.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Loammi based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Loammi has pleaded guilty to Count Four of the Superseding Information, charging him parading, demonstrating, or picketing inside of a Capitol Building, in violation of  40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C

---

[8] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. The table is filed as Government Exhibit 7.

misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among co-defendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than co-defendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With

regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

26

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years.  For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences.  The statutory range for a petty offense is zero to six months.  Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense.  And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants to terms of incarceration when the defendant witnessed confrontations with police officers and has disregarded police orders.  *See, e.g.*, *United States v. Register*, 1:21-cr-00349 (TJK) (75 days'

incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows and ignored officers' attempts to clear him and others from the building); *United States v. William Tryon*, 1:21-cr-00420 (RBW) (50 days' incarceration where the defendant disregarded directions by police officers and remained inside the Capitol until he was forced to leave).

Three cases that are particularly comparable to Loammi are as follows: *United States v. Edward Hemenway, II and Robert Bauer*, 21-cr-000049(TSC), *United States v. Savannah McDonald and Nolan Kidd*, 21-cr-429(CRC), and *United States v. Andrew Galloway,* 22-cr-12(CRC).

On January 6, Hemenway along with his cousin Robert Bauer attended the "Stop the Steal" rally at the Ellipse. Hemenway and Bauer stayed inside the Capitol for 17 minutes. While inside the building, Hemenway joined a mob of people and walked through the building from the Senate Wing Door, into the Crypt, and to the Memorial Door. He took photographs and selfies, seemingly celebrating his presence amongst the chaos. Hemenway chanted with the crowd and watched a rioter break into an office and rioters assault police officers. Outside the building, Hemenway saw a rioter trying to break a window, yet he stood on a military vehicle with his arms raised in triumph. Hemenway admitted to his actions only a few days after the riot and accepted responsibility early through a plea agreement. Notably, Hemenway expressed remorse for his conduct.

Bauer's conduct mirrored Hemenway's conduct in many ways. Bauer also took selfies of himself inside of the Capitol. In one selfie, Bauer raised his middle finger. Bauer and Hemenway remained with one another during their time in the Capitol. Like Hemenway, he admitted to his actions within days of the riot and accepted responsibility early through a plea agreement. Unlike

Hemenway, Bauer did not express remorse for his conduct, instead stating to FBI that he did not feel that his conduct was wrong.

Loammi's conduct is similar to that of Hemenway and Bauer.  All three of the Yazdani-Isfehani siblings entered the Capitol and walked through the building, ignoring orders from USCP officers to leave the building.  Indeed, Loammi spent 37 minutes inside of the Capitol.  Loammi stood by and watched as officers responded to the shooting of Ashli Babbitt, while Hemenway and Bauer watched a rioter break into an office and rioters assault police officers.  All three stood and watched as police struggled to gain control of the Capitol.  Additionally, Loammi, like Bauer never expressed remorse for his conduct.

Unlike Hemenway and Bauer, Loammi had a personal encounter with a police officer who was ordering him to leave the Capitol who instructed him and his siblings to leave the Capitol multiple times.  Neither Hemenway nor Bauer engaged directly with officers inside of the Capitol.

On the other hand, Hemenway and Bauer had significant criminal histories, while Loammi has no criminal history.

In that case, Hemenway and Bauer each pled guilty to misdemeanor charges of violating 40 U.S.C.  § 5104(e)(2)(G). Judge Chutkan sentenced Hemenway and Bauer each to 45 days of incarceration.

In *United States v. Savannah McDonald and Nolan Kidd*, this Court sentenced defendant Kidd to a term of imprisonment of 45 days.  Defendant McDonald was sentenced to serve 21 days of imprisonment.

The government highlighted the following aggravating factors in request for a period of incarceration: (1) Kidd observed, filmed and cheered when a mob of rioters swarmed through a police line on the Upper West Terrace Staircase before he entered the Capitol Building; (2) Kidd

entered the Capitol Building despite having been sprayed with tear gas three times by police officers; (3) Kidd was part of the first group of rioters to enter the Capitol Building on January 6, and entered through the Senate Fire Door less than 20 seconds after it was opened by other rioters; (4) Kidd spent approximately 40 minutes inside the Capitol Building; (5) Kidd gave an interview shortly after exiting the Capitol Building and sent messages on social media that displayed a total lack of remorse, including referring to himself as a "stormtrooper" and bragging that he "went farther than almost anyone into the building;" and (6) Kidd subsequently tried to hide evidence of his participation in the riot because the "FBI are trying to identify anyone that got inside," and he also provided false or misleading information to law enforcement officials about the riot.

As it relates to McDonald, McDonald (1) observed and cheered when a mob of rioters overran police on the Upper West Terrace Staircase; (2) entered the Capitol Building despite having been sprayed with tear gas three times by police officers; (3) was part of the first wave of rioters who entered the Capitol Building on January 6, and she entered through the Senate Fire Door less than 20 seconds after it was opened by other rioters; (4) spent approximately 40 minutes inside the Capitol Building on January 6, where she took videos bragging about being the only girl to make it to the Senate and having been tear gassed by police officers; (5) gave an interview shortly after exiting the Capitol Building and sent messages via social media that displayed a total lack of remorse; and (6) subsequently tried to hide evidence of her participation in the riot and provided false or misleading information to law enforcement, including claiming that police officers invited her through the doors of the Capitol.

Last, in *Galloway,* 22-cr-12(CRC) this Court sentenced Galloway to a period of incarceration of 30 days. The Court considered that Galloway: (1) breached the U.S. Capitol through a broken window near the Senate Wing Doors within approximately 11 minutes of the

initial breach, which occurred when other rioters smashed a window in that same location, doing so even after he saw police officers using pepper spray and droplets of blood; (2) made clearly false, self-exonerating statements to FBI agents about his participation in the riot; (3) loudly and publicly expressed his support for the riot shortly after leaving the Capitol building; (4) as a former serviceman in the United States Navy for four years, knew that the assault on the Capitol Building on January 6 where a mob of angry rioters vastly outnumbered the police officers valiantly attempting to defend the building and its occupants would likely cause serious injuries to those officers; (5) has followed social media posts of the Proud Boys even after the January 6 riot, and (6) has not offered a sincere expression of remorse for his conduct on January 6.

Loammi's conduct on January 6 is similar to the defendants' conduct referenced above. He was one of the initial rioters to enter the Capitol following a volatile breach of a police officer line at the Upper West Terrace.  On numerous instances, he clearly saw officers struggling to protect themselves from the of rioters.  First, he arrived at the West Front of the Capitol when a line officers was breached by the northwest stairs.  Loammi vividly described seeing violence directed towards officers and destruction of the Capitol prior to entering the Capitol.

This Court should also consider that Loammi boasted about not being identified by law enforcement as a result of his sisters deleting and or destroying evidence that they were inside of the Capitol.  A similarity that Abigail and Loruhamah shared with the defendants *Kidd* and *McDonald* is the commonality of the destruction of evidence.  In his post-arrest interview, Loammi claimed that Loruhamah and Abigail removed a "storage disk" from his phone that contained the videos and photographs taken while they were inside of the Capitol for fear that the videos and photographs may be discovered.  In a separate interview, Loammi's friend told the FBI that Loammi told him/her that he had no reason to be concerned about law enforcement finding

evidence that he entered the Capitol because the evidence was destroyed.  In her FBI interview, Loruhamah admitted to taking the disk out of Loammi's telephone, claiming that her sister Abigail may have been in possession of the disk.  While Loruhamah described the photographs/videos of consisting mainly of monuments, the images and videos supporting this memorandum show Loammi utilizing his phone while inside of the Capitol.  Notably, Loammi filmed the officers responding to the shooting of Ashli Babbitt.  Loammi praised the fact that he, and presumably his siblings, would not be identified by law enforcement after January 6 because the photographic and video evidence had been destroyed.

Like the defendants in the above-referenced cases, Loammi, has not expressed remorse.

And while Loammi's case may be distinguished due to the lack of a criminal history, and a lack of using social media either prior to after January 6 to boast about his conduct on January 6, a period of incarceration remains appropriate and not disparate given the fact that Loammi has showed a complete disregard for police officers inside of the Capitol in the face of clear warnings and demonstrations showing that the officers inside of the Capitol were overwhelmed and overrun by the rioters.

The government is also requesting a split sentence of 30 days' incarceration followed by 30 days of probation for Abigail and Loruhamah, as well. All three defendants demonstrated similar conduct at the Capitol.  Notably, they entered at the same location, the Upper West Terrace Doors, each claiming that they were allowed to enter by the beleaguered officers who had just been overrun by a crowd of rioters.  While inside of the Capitol, they ignored the orders of officers instructing them to leave the building.  They also ignored multiple signs that they needed to leave, including the alarm ringing inside of the building and the tear gas released by the officers.  Each

of the defendants has benefitted from the destruction of evidence.  Because their behavior is similar, the government is requesting the same sentence be imposed for each of the defendants.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.      Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21cr315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the

Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar.

15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C.

April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022)

(same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United

States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*,

21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF),

ECF 74 (D.D.C. August 1, 2022) (same).[9]  In addition, for any defendant placed on probation, a

sentencing court may impose incarceration for a brief interval as a condition of probation under

18 U.S.C. § 3563(b)(10).

## VI.   A sentence imposed for a petty offense may include both incarceration and probation.

### A.   *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains

the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984),

*codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989)

(noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal

sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter

227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"),

subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from

subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

---

[9] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months' incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

court may impose a term of continuous incarceration that exceeds two weeks[10] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[11] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

---

[10] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[11] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### B. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1,

Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term

of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Loammi pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

VII.   **A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### A.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[12]

### B.  *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

---

[12] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[13]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Loammi to a split sentence of 30 days' incarceration, followed by 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters

---

[13] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Brittany L. Reed*    
BRITTANY L. REED
LA Bar No. 31299
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
650 Poydras Street, Ste. 1600
New Orleans, LA 70130
Office: 504-680-3031
Brittany.Reed2@usdoj.gov

## CERTIFICATE OF SERVICE

On this 1st day of November, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Brittany L. Reed*    
BRITTANY L. REED
Assistant United States Attorney